IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARYOUSH TAHA | : | CIVIL ACTION |
| *Individually and on Behalf of* | : | |
| *All Others Similarly Situated* | : | |
| | : | |
| v. | : | |
| | : | |
| BUCKS COUNTY, *et al.* | : | NO. 12-6867 |

**MEMORANDUM**

**L. Felipe Restrepo, J.**                                                                December 30, 2015

Before the Court is the motion of Defendant Citizen Information Associates, LLC ("CIA") seeking summary judgment, pursuant to Federal Rule of Civil Procedure 56, on Plaintiff Daryoush Taha's sole remaining claim against it for false light invasion of privacy under Pennsylvania law.  For the reasons that follow, CIA's motion is granted.

**I.   BACKGROUND**

Taha was arrested by the Bensalem police on September 29, 1998 and processed into custody at the Bensalem Police Department.  Taha was then transferred to the Bucks County Correctional Facility ("BCCF") and charged with a criminal offense.  Pursuant to his arrest, Taha's booking photograph, or mugshot, was taken.[1]  Although Taha believed himself to be innocent of all charges against him, he accepted an Accelerated Rehabilitative Disposition

---

[1] Taha points out in his opposition brief the distinction between a booking photograph and a mugshot: the former is taken at the prison or county jail, often while the subject of the photograph is clad in a prison jumpsuit, whereas the latter is taken at the police station with the subject still in street clothes.  *See* Pl.'s Opp. Br. (ECF Document 98) at 3 n.1.  Although the parties appear to agree that Taha's photo at issue in this matter was a "booking photograph," they have used the terms interchangeably throughout this litigation and do so in their summary judgment briefing.  For the sake of simplicity, the Court will hereinafter use the term "booking photograph," as this distinction has no bearing on the Court's analysis or conclusions here.

("ARD") in January 1999 to ensure expungement of his arrest. Taha completed the ARD program one year later and the Bucks County Court of Common Pleas then entered an expungement order.

In 2007, Bucks County and the BCCF created a public website that included the booking photographs and arrest records of individuals who had been incarcerated in Bucks County over a period of many years. The website, referred to as the Inmate Lookup Tool, included Taha's 1998 booking photograph and arrest information, but did not include details on the subsequent ARD or expungement.

In December 2011, CIA obtained Taha's booking photograph and arrest information, along with Taha's name and age, directly from the BCCF website and re-published them on CIA's own websites bustedmugshots.com and mugshotsonline.com. CIA did not request or obtain Taha's consent for the publication. No information about the subsequent expungement was provided on CIA's websites, and no representative of CIA independently verified whether Taha's record had been expunged before it published the information. CIA relied on Bucks County to ensure that the information published on the Inmate Lookup Tool was accurate and eligible for release, with a belief that nearly all larger municipalities, like Bucks County, had a procedure in place to prevent the dissemination of expunged records.[2]

During the relevant time period, CIA generally charged individuals a fee to have their photographs and arrest information removed from its websites. However, upon request, CIA would remove from its websites any record that had been expunged, free of charge. To initiate removal of an expunged record, an individual could follow an online procedure or contact CIA via phone or e-mail. At no point prior to the filing of this action did Taha (or anyone on Taha's

---

[2] According to a representative from the Bucks County Department of Corrections, such a procedure did, in fact, exist in the County, though CIA does not claim that it was specifically made aware of Bucks County's procedure.

behalf) inform CIA that Taha's record had been expunged or request to remove Taha's information and photograph from CIA's websites.

Taha's Third Amended Complaint (ECF Document 72) contains a single claim against CIA for false light invasion of privacy under Pennsylvania law (Count III). Taha alleges in Count III that the placement of his booking photograph and arrest record on CIA's websites publicized Taha's arrest, which had been expunged, and falsely portrayed him as a convicted criminal. CIA now moves for summary judgment on this claim.

## II. JURISDICTION AND LEGAL STANDARDS

The Court has jurisdiction in this diversity action pursuant to 28 U.S.C. § 1332, and Pennsylvania's substantive law applies. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938). In interpreting Pennsylvania law, this Court is bound by the decisions of the Pennsylvania Supreme Court. *See Wirth v. Aetna U.S. Healthcare*, 469 F.3d 305, 309 (3d Cir. 2006). When there is a novel question of law or the law is unclear and there is no controlling precedent on the issue from the Pennsylvania Supreme Court, this Court must predict how the Pennsylvania Supreme Court would rule and give "due regard, but not conclusive effect, to the decisional law of lower state courts." *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000); *see also id.; West v. AT&T Co.*, 311 U.S. 223, 237 (1940).

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the court must consider "the underlying facts and all reasonable

3

inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citation and internal quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the movant carries this initial burden to show that the non-moving party cannot support its claims with the available evidence, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that there is a genuine issue for trial" as reflected in affidavits, depositions, answers to interrogatories, or admissions on file. *See id.* at 323-24. The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). It must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Where the non-moving party fails to make such a showing, summary judgment must be granted for the moving party. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

Although Taha's briefing raised a limited number of facts he contended were disputed and material to his false light claim, Taha subsequently conceded at oral argument, when asked

directly by the Court, that there were no facts in dispute and that Taha's claim is ripe for determination as a matter of law.[3]

## III. DISCUSSION

Four distinct torts are available to plaintiffs under Pennsylvania law where there has been an alleged invasion of privacy: (1) intrusion upon seclusion; (2) appropriation of name or likeness; (3) publicity given to private life; and (4) publicity placing a person in false light. *Marks v. Bell Tel. Co. of Pa.*, 331 A.2d 424, 430 (Pa. 1975). In Count III of the Third Amended Complaint, Taha brings a claim against CIA for the last of the four torts, which is commonly referred to as "false light invasion of privacy."[4] Pennsylvania has adopted the definition of false light invasion of privacy provided by the Restatement (Second) of Torts, which describes the tort as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E; *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (defining the tort as one that "imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity'" (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181,

---

[3] *See* Mot. Summ. J. Hr'g Tr. 9:13-11:11, Apr. 24, 2015 ("THE COURT: Are there any facts in dispute with respect to . . . CIA? MR. SHUB: No. THE COURT: No facts in dispute, okay.").
[4] Taha also alleges in Count III a claim for false light invasion of privacy against Unpublish, LLC ("Unpublish"), a separate defendant in this matter. *See* Docs. 69, 72. Upon review of the docket, it appears that Unpublish has not filed an Answer to the operative Third Amended Complaint or otherwise moved to dismiss this sole claim against it.

1188 (Pa. Super. Ct. 1988))).[5]  The standard set forth in subsection (b) of the Restatement mirrors the "actual malice" standard established by the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), which was designed to impose the First Amendment protections of free speech and press on common law defamation claims.  The Supreme Court applied the *New York Times* "actual malice" standard to false light claims in *Time, Inc. v. Hill*, 385 U.S. 374 (1967).  In short, false light invasion of privacy claims incorporate the same First Amendment protections as claims for defamation under state law.

     The parties agree that the "actual malice" standard applies to Taha's false light claim here, and that CIA never had actual knowledge of Taha's expungement.  *See* Def.'s Br. (Doc. 96-2) at 12-15; Pl.'s Opp. Br. 16-20.  The parties disagree on whether Taha has carried his burden to show that CIA acted with reckless disregard toward the "falsity" of the information published and toward the false light in which Taha would be placed.  CIA points to the declaration of its chief executive officer, Kyle Prall, in support of its argument that its publication of Taha's arrest information was not done with reckless disregard.  Prall declares that CIA relied on the accuracy of the records of Bucks County, stating: (1) "CIA is aware that . . . nearly all larger municipalities, such as Bucks County, have procedures in place to ensure the accurate dissemination of information and systems to prevent the dissemination of expunged records"; (2) "CIA obtained the information regarding Plaintiff's arrest from the Bucks County Correctional Facility's website"; and (3) "CIA *relied on the publication of the records by Bucks County as evidence that records were accurate and eligible for release*."  Def.'s Br., Ex. A, Prall Decl. (Doc. 96-4) ¶¶ 6-7, 10 (emphasis added).  CIA did not independently investigate whether Taha's

---

[5]     Even where, as here, published information is literally true, a plaintiff may "establish falsity by showing that a defendant 'selectively printed or broadcast true statements or pictures in a manner which created a false impression.'" *Graboff v. Colleran Firm*, 744 F.3d at 136 (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1189 (Pa. Super. Ct. 1988)).

record, or any other record culled from the BCCF website, had been expunged prior to posting it on its own websites.  *See* Hr'g Tr. 19:4-5.

As noted in Section II, *supra*, Taha's briefing identified a limited number of factual disputes that he argued were material to Taha's false light claim and the issues raised in CIA's motion, including whether CIA acted with actual malice, or specifically, acted with reckless disregard.  However, at oral argument on CIA's motion, Taha conceded that there were no facts in dispute.[6]  Accordingly, the Court may resolve as a matter of law whether CIA's actions here – re-publishing Taha's information from the Inmate Lookup Tool without independent investigation – amount to actual malice to support Taha's false light claim.  The Court concludes that they do not.

The United States Supreme Court has acknowledged that "[r]eckless disregard . . . cannot be fully encompassed in one infallible definition" and that "its outer limits will be marked out through case-by-case adjudication."  *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968).  But the Court has made clear that the standard is subjective, based on a defendant's actual state of mind, not objective:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that *the defendant* in fact entertained serious doubts as to the truth of his publication.  Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* at 731 (emphasis added).  And since *New York Times*, some of the boundaries of this constitutional standard have been established.[7]  Where a defendant finds internal inconsistencies

---

[6]    So the Court understands Taha to agree with the facts as set forth by CIA, including that CIA relied on Bucks County's publication of records on the Inmate Lookup Tool as evidence that those records were accurate and suitable for release to the public.

[7]    The contours of the "actual malice" standard are most often explored in the context of defamation claims, but as discussed above, the same standard applies to false light invasion of privacy claims.  *See,*

or seemingly reliable information that contradicts the defendant's assertions, but publishes those assertions anyway, the defendant's actions may meet the "actual malice" test. *See Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 161 n.23 (1967). Likewise, where a defendant had "obvious reasons to doubt the veracity of [an] informant or the accuracy of [an informant's] reports," a court may also find actual malice. *St. Amant*, 390 U.S. at 732.

On the other hand, a publisher's failure to investigate, standing alone, will not amount to reckless disregard. *See id.* at 733; *Curtis Publ'g Co.*, 388 U.S. at 153-54; *New York Times*, 376 U.S. at 287; *see also McDowell v. Paiewonsky*, 769 F.2d 942, 951 (3d Cir. 1985) (finding that "[w]hile it arguably may have been negligent" for the defendant "not to have checked independently the veracity" of certain statements, the defendant's fault did not rise to the level of actual malice where the defendant had relied on official reports and news accounts). Rather, there must be some evidence that the defendant's failure to investigate was an attempt to purposefully avoid contradictory information in the face of the defendant's own, existing doubts about the truth. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).

Here, Taha points to nothing in the record that reflects CIA *actually believed* Bucks County included expunged records on the Inmate Lookup Tool. He likewise points to nothing that hints of serious doubts entertained by CIA on this issue. He has not offered any evidence to suggest that an aspect or characteristic of the Inmate Lookup Tool raised CIA's suspicions that expunged arrests may have been included on the Tool. Nor has he offered any evidence that CIA received tips or other information that expunged records might be included.[8] Taha points to nothing to suggest that Bucks County had a reputation for inaccurate recordkeeping, ignoring

---

*e.g.*, *Graboff*, 744 F.3d at 137 (observing that "Pennsylvania inferior courts consistently apply the same analysis to both types of claims when the causes of action are based on the same set of underlying facts.")

[8] In fact, Taha offers no evidence that CIA ever entertained "serious doubts" that expunged arrest information was included on *any* municipality's similar website from which CIA pulled information.

expungement orders, or publicizing information regarding expunged arrests. At bottom, there is simply no indication of "obvious reasons to doubt the veracity" of the information provided by Bucks County that might have triggered a duty to investigate further and would suggest "purposeful avoidance" by CIA. Indeed, one might assume that Bucks County and the Bucks County Department of Corrections would be among the *most* reputable sources for arrest record information maintained by the County.

Taha makes much of CIA's profit motivations for posting arrest information on its websites, emphasizing that the sites "were a scheme by Defendants" aimed at maximizing profits and "they don't care who gets hurt." *See* Pl.'s Opp. Br. 19. Perhaps that is true. Certainly, CIA makes no attempt to deny that its websites were business endeavors, designed to generate profit. However, this fact alone will not suffice to prove actual malice. *Harte-Hanks Commc'ns*, 491 U.S. at 667 ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."). Furthermore, while Taha repeatedly insists that CIA sought *all* records, including expunged records, for its websites in order to exploit them for maximum financial gain, his argument is directly refuted here by evidence that CIA did not charge to remove expunged records from its websites, a fact to which the parties specifically agreed at oral argument.

The Court notes that even if Taha had not conceded that there were no material facts in dispute, Taha has not introduced evidence of actual malice sufficient to create a genuine dispute of material fact and change the Court's conclusion here. In his briefing, Taha challenges CIA's evidence of reliance on Bucks County, arguing that CIA "did not rely upon Bucks County to cull the expunged or sealed arrestees from their website, but instead were looking for all arrestees,

regardless of whether their records had been sealed or expunged, to place on their websites." *See* Pl.'s Opp. Br. 17.  In an attempt to support this assertion, Taha leans heavily on a September 2012 decision by a New York state trial court, which addresses CIA's Freedom of Information Law ("FOIL") request to the New York City Department of Corrections ("NYDOC") for specific information from August 2011 inmate booking records.  Taha argues that this decision and the underlying New York FOIL request, which does not specifically ask the NYDOC to withhold sealed or expunged records, suggest that CIA's claim of reliance on Bucks County to remove expunged records here is disingenuous.  But Taha fails to establish any connection between the New York matter and the facts of his own case.  There was no FOIL or similar public records request in this case and the parties do not dispute that CIA obtained Taha's booking photograph and arrest information directly from the BCCF website.  Taha has provided no evidence whatsoever that even insinuates CIA sought expunged records from Bucks County *specifically*.

      Although Taha's *allegations* of actual malice were sufficient to support his claim for false light at the early stages of litigation and overcome CIA's motion to dismiss, *see Taha v. Bucks Cty.*, 9 F. Supp. 3d 490, 493-94 (E.D. Pa. 2014), Taha must point to *evidence* in the record of actual malice in order to survive CIA's motion for summary judgment now, *see Seidman v. Minn. Mut. Life. Ins. Co.*, 40 F. Supp. 2d 590, 595-96 (E.D. Pa. 1997).  He has failed to do so.  Ultimately, Taha offers nothing more at this late stage than his own conclusory allegations, unsupported opinions, and suspicions that CIA sought expunged records from Bucks County for publication, which are insufficient to establish a genuine issue of material fact for trial.  Because Taha has not presented sufficient evidence to create a genuine issue of material fact on the issue

of whether CIA acted with actual malice when re-publishing Taha's arrest information, summary judgment is granted for CIA on Taha's false light claim.[9]

## IV. CONCLUSION

For the foregoing reasons, CIA's Motion for Summary Judgment is granted and CIA is dismissed as a defendant to this action. An appropriate Order follows.

---

[9] CIA also argues that summary judgment is appropriate because: (1) CIA did not publish any private facts about Taha; (2) CIA never published any false statement; and (3) CIA's publication is protected by the First Amendment. *See* Def's Br. 2. Since Taha has not carried his burden of showing reckless disregard, it is unnecessary to address CIA's other arguments here.