## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARYOUSH TAHA,
           Plaintiff,

      v.

BUCKS COUNTY PENNSYLVANIA,
BUCKS COUNTY CORRECTIONAL
FACILITY,
          Defendants.

CIVIL ACTION

NO. 12-6867

**FILED**

OCT 0 4 2019

KATE ~~BARKMAN~~, Clerk
By~~____~~ Dep. Clerk

### OPINION

This certified class action arises from a decision by Defendants Bucks County Correctional Facility ("BCCF") and Bucks County in January 2011 to create an "Inmate Lookup Tool" ("the ILT"). Through the ILT, Defendants published information online about 66,799 individuals who had been held or incarcerated at various times over the course of decades at the BCCF. One of the individuals whose information was published, Plaintiff Daryoush Taha, filed this lawsuit on behalf of himself and all persons whose criminal history record information was made available on the ILT. He claimed that by publishing this information, Defendants violated Pennsylvania's Criminal History Record Information Act ("the CHRIA"), 18 Pa. C.S.A. § 9101 *et seq.* The Court granted Plaintiff partial summary judgment on liability. At trial, the only issue for the jury was whether Defendants willfully violated the CHRIA. *See* 18 Pa. C.S.A. § 9183(b)(2) ("Exemplary and punitive damages of *not less* than $1,000 nor more than $10,000 *shall* be imposed for any violation of this chapter . . . found to be willful.") (emphasis added). At the close of evidence, the jury returned a verdict finding Defendants committed willful violations and awarded each class member $1,000 in punitive damages.

Prior to the case going to the jury, Defendants had twice moved pursuant to Federal Rule

of Civil Procedure 50 for judgment as a matter of law, which the Court denied in both instances. Presently before the Court are Defendants' post-trial motions, including a renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50, and a Motion for a New Trial pursuant to Federal Rule of Civil Procedure 59, or, in the alternative, a Motion for Remittitur. For the reasons that follow, Defendants' motions shall be denied.

## I.    FACTS

In September 1998, Plaintiff Taha was arrested by the Bensalem Police Department and transported to the BCCF, where he was charged with harassment, disorderly conduct, and resisting arrest. His photo was taken. He was released the following day and, eventually, the Court of Common Pleas of Bucks County ordered the Clerk of Courts of Bucks County, the Bucks County District Attorney, the district court, and the arresting agency to expunge Plaintiff's "arrest and other criminal records." *See Taha v. Bucks County*, 2016 WL 2345998, at *1 (E.D. Pa. May 4, 2016) ("*Taha II*").

In 2008, Defendants created the ILT. In January 2011, Defendants launched the enhanced version of the ILT at issue in this case—an internet-accessible and searchable database that included information about "individuals who had been held or incarcerated at the BCCF from 1938 onward, a total of 66,799 people." *Taha v. County of Bucks*, 862 F.3d 292, 297 (3d Cir. 2017) ("*Taha III*"). Defendants made public through the internet information about the various class members, including name, race, weight, hair and eye color, arrest dates, arrest charges, and where available, the Federal Bureau of Investigation numbers ("FBI numbers") and state fingerprint identification numbers ("State ID numbers"). *Id.*[1]

---

[1] The decision to publish such information on the internet was a *volte-face* from Defendants' historical practice. Prior to the implementation of the ILT, Defendants stored inmates' paper records in a secure area with criminal history record information kept "under lock and key." Only authorized persons had access to inmate records. Defendants ensured that confidential inmate paper records were not released to the media. The Department of

2

Harris Gubernick was the Director of the Bucks County Department of Corrections from 2002 until February 2011, which spans the time when the ILT was first created and when the enhanced version with additional information and photographs was introduced. At trial, Gubernick testified that he had little familiarity with the CHRIA beyond his training for certification and that he delegated "[t]he planning and the implementation" of the ILT to his subordinate, Clarke Fulton. Fulton was the Bucks County Department of Corrections' Captain of Administrative Affairs and was charged with overseeing software applications, assisting in litigation defense, and implementing the ILT. Despite Fulton's job description, he testified that Gubernick made the final decisions affecting the scope of the data posted on the ILT. Furthermore, he testified that he considered Gubernick more knowledgeable than he and that Gubernick "had a longer experience with the [CHRIA] law." Each man thus indicated the other was the decisionmaker regarding the ILT.

The authoritative guide to the CHRIA is the Pennsylvania Attorney General's Criminal History Record Information Act Handbook ("the Handbook"), which Defendants' witnesses sometimes referred to as "the Bible." The trial was infused with disputes as to what falls within the definition of "criminal history record information" for the purposes of the CHRIA. In their post-trial briefing, Defendants rely on Chart 9 of the Handbook, which describes Section 9122 of the CHRIA, to justify their reading of the term. But neither Fulton nor Gubernick consulted the Handbook while implementing the ILT. Fulton last read the Handbook during his training in 2003, eight years before the enhanced ILT was rolled out, and Gubernick never consulted the Handbook at all regarding compliance with the CHRIA. Gubernick also testified that he relied on Section 9104 of the CHRIA to support his conclusion that "criminal history record

---

Corrections had post orders— standard operating procedures—for keeping physical records, but never updated them to encompass electronic records

3

information" was information from a rap sheet and that charge information from court documents did not constitute criminal history record information. He acknowledged, however, that the term "rap sheet" does not appear in the statute, and he never sought clarification to confirm his understanding was correct.

The Commonwealth Law Enforcement Assistance Network ("CLEAN") is a database containing criminal record information, which is maintained by the state police for law enforcement purposes. Information on CLEAN, including FBI and State ID numbers that identify individuals, is classified as confidential, and Defendants knew that CLEAN information was meant to be confidential. Indeed, Fulton received Pennsylvania Justice Network ("JNET") training, which discussed the careless use of CLEAN information.

Fulton was the JNET Terminal Agency Coordinator ("JTAC"), and as such, he had access to the JTAC training manual. In 2008, Fulton inquired of a corporal with the Pennsylvania State Police as to whether posting the FBI and State ID numbers on the ILT was permissible, and was told that it "might be"—an answer which Fulton testified raised "some question in my mind." Fulton then consulted the JTAC training manual, which "did not speak . . . directly in terms of dissemination" but did say that "information on the CLEAN network is considered confidential." He interpreted this to mean State ID and FBI numbers "were not protected" and made no further effort to investigate whether they could be disseminated.

Gubernick and Fulton met periodically with what they referred to as the Criminal Justice Advisory Board ("CJAB"), which included representatives from the district attorney, the public defender, county administration, and the Department of Corrections, among others, from Bucks County and other counties. There was no testimony presented regarding the CJAB's mission or

whether it was within the group's purview to advise on the appropriate use of criminal history record information. Gubernick testified that no one at CJAB raised any flags about posting the data on the internet because the ILT issue "was never raised by anyone." At the January 2011 CJAB meeting, "no one mentioned" the privacy of the 67,000 people who interacted with the BCCF between 1938 and 2011.

Gubernick testified that prior to launching the Bucks County ILT, he analyzed the ILTs of other counties—Montgomery and "possibly" Fayette and Berks. He clicked on the home pages and was not able to click through to the rest of the counties' sites. He did not contact administrators in those counties. Defendants did not present testimony about whether they knew in 2011 whether other counties had received complaints or citations in connection with their ILTs.

Defendants never sought legal advice in the course of implementing the ILT. Fulton testified that during his 35-year career, he only sought legal advice from the County Solicitor once when he became aware of a discrepancy concerning the Department of Corrections' interpretation of a new Pennsylvania law concerning DNA blood samples. He never had a discussion with any lawyer regarding compliance with the CHRIA, and Gubernick never instructed him to obtain an opinion from the County Solicitor. Indeed, during the 2011 changes to the ILT, nobody sought guidance from the County Solicitor, the Pennsylvania Attorney General, or outside counsel.

Gubernick and Fulton both understood that privacy was an important part of the CHRIA. Gubernick testified that he had concerns about publicly posting confidential information. Fulton testified that he understood the need for the confidentiality of inmate records and understood that improper exposure of criminal history record information could ruin reputations. He appreciated

5

the dangers of that information falling into the hands of third-party operators like Mugshots.com because his daughter's mugshot had been disseminated on the internet in that manner, and, on two occasions, she had asked him to pay to have her mugshot removed from the site, which he did.

Fulton testified that in 2011, he did not believe that "any of the information on [the] ILT could be considered CHRIA." Gubernick was asked whether, in 2011, he had "any thought in [his] mind at all that [he] could be possibly breaking the law?" He responded: "Absolutely not." But Fulton knew the 2011 changes, which included adding photographs, to the ILT were "dramatic." Gubernick also had concerns about publicly posting confidential information. Yet Defendants did nothing to customize the ILT to remove confidential information. Fulton did not reach out to the software vendor to ask about customizing the ILT until March 2013. He was also unaware of any inspection by any agency approving how Defendants handled the CHRIA.

Nor did Defendants address requests to have outdated or incorrect information removed from the ILT. One man, concerned that the ILT posting of information about his father was hurting his father's ability to find a job, emailed Bucks County about his father's record, explaining that it incorrectly stated that his father had spent a week incarcerated in 1995 when, in fact, he had only spent one weekend. Fulton received the email but never responded to it.

## II.     PROCEDURAL HISTORY

Plaintiff sued on December 7, 2012, alleging that Defendants violated the CHRIA by disseminating "criminal history record information," 18 Pa. C.S.A. § 9102 (defining the term), in a manner prohibited by the Act. *Taha v. Bucks County*, 172 F. Supp.3d 867, 872 (E.D. Pa. 2016) ("*Taha I* "). The Court held Defendants did violate the CHRIA, *id.*, and subsequently certified a class of "all persons whose criminal history record information was made available on the BCCF

Inmate Lookup Tool," *Taha v. Bucks County*, 2016 WL 2346000 (E.D. Pa. May 4, 2016) (order); *see also Taha II*, 2016 WL 2345998, at *4. The Third Circuit affirmed the class certification decision, agreeing that "the only remaining factual issue is whether defendants willfully violated CHRIA," *Taha III*, 862 F.3d at 309, because punitive damages are required under the statute in a minimum amount of $1,000 when a plaintiff shows that any violation of the CHRIA was willful, *see* 18 Pa. C.S.A. § 9183(b)(2).[2]

## III. LEGAL STANDARDS

### A. Renewed Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) provides that "[n]o later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." The grant of a motion for judgment as a matter of law after trial is warranted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). In considering the evidence, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Id.* "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict . . . ." *Id.* Ultimately, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* (internal quotation omitted). In other words, judgment

---

[2] Defendants' motions for summary judgment were denied on the issues of whether state agencies may be held liable for punitive damages under the CHRIA and whether willfulness under the CHRIA requires a subjective understanding and reckless disregard. *Taha v Bucks County Pa*, 367 F. Supp.3d 320, 330–31 (E.D. Pa. 2019) ("*Taha IV*").

as a matter of law should be granted if the record is "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir. 1980) (internal quotation omitted). Because the jury returned a verdict in favor of the plaintiff, the Court in ruling on judgment as a matter of law must examine the record "in a light most favorable to the plaintiff," giving him the benefit of all reasonable inferences, "even though contrary inferences might reasonably be drawn." *Dudley v. S. Jersey Metal, Inc.*, 555 F.2d 96, 101 (3d Cir. 1977).

### B. Motion for New Trial

On motion, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). However, "it should do so only when 'the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand.'" *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)). The power to grant a new trial is limited to ensure that a court "does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *See id.* (quoting *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996)); *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996) (en banc).

### C. Motion for Remittitur

Under Rule 59(e), a party may seek alteration or amendment of the verdict. The Third Circuit has explained that courts reduce damages awards in one of two circumstances, which are often colloquially referred to as "remittitur": when a court reduces an award as excessive or legally unsupported to satisfy constitutional due process concerns, and when it considers an award unreasonable on the facts of the case at hand. *Cortez v. Trans Union, LLC*, 617 F.3d 688,

715–16 (3d Cir. 2010); *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986). "There must be a rational relationship between the specific injury sustained and the amount awarded." *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987). "While a district court has discretion in determining whether a jury's verdict is excessive, it is undisputed that the court *may not* vacate or reduce the award merely because it would have granted a lesser amount of damages." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989).

## IV.   DISCUSSION[3]

Underlying the analysis of each of these motions is a challenge by Defendants to the jury instruction regarding the definition of "willfulness." At trial, the jury was instructed, in relevant part:

> "Willful" does not mean that Defendants intended to violate the CHRIA law, or intended to harm Mr. Taha or class members. It does not mean that Defendants acted with malice or ill will. But it requires plaintiff to prove more than that Defendants were negligent or careless or made an honest mistake.
>
> A willful violation of the CHRIA law means that Defendants acted with reckless disregard or indifference to their legal obligations. A person has committed a willful violation for purposes of CHRIA if he or she acts with reckless disregard or indifference to their legal obligations.
>
> Plaintiff does not have to show that Defendants were aware their actions violated CHRIA in order to prove reckless disregard or indifference in violating the law. Defendants could have held a mistaken belief about CHRIA and still could have acted with reckless disregard or indifference. The issue for you is whether, in the facts and circumstances of this case, Defendants were reckless or indifferent in violating CHRIA.
>
> In evaluating the jury instruction on willfulness, Defendants urge the Court to consider it

in tandem with the jury instruction regarding the amount of punitive damage, which was:

> . . . [I]f you decide that the County willfully violated CHRIA, it is your job to set the amount of punitive damages. The Act entitles the Plaintiff and each class member to a sum of not less than $1,000 nor more than $10,000 if you find that the County's violation of CHRIA was willful.

---

[3] Defendants use a footnote to object to a "lack of claims administration process" and to seek input into such a process  The parties subsequently have agreed to meet and confer regarding how to move forward with administering the claims.

Rather CHRIA mandates – or to put it another way – requires imposition of these statutory damages for any willful violation.

It is up to you to set the amount of damages between $1,000 and $10,000 based upon all the evidence of this case. In determining an amount of punitive damages, you must consider whether the County subjectively appreciated the risk of harm to individuals protected by CHRIA. You must not consider whether and to what extent individual class members were harmed by the County's violation.

The instructions addressed the only open issues at trial: (1) whether Defendants'

violations were "willful"; and, (2) what amount of punitive damages should be imposed.

Defendants contend that the Court's instruction to the jury on the definition of "willful"

under the CHRIA was erroneous because it did not accurately reflect the definition of the word

under Pennsylvania common law. They further argue that the Court's use of subjective-

appreciation-of-the-risk language in its instruction on punitive damages but not in its instruction

on willfulness compounded the error in that it inappropriately suggested to the jury that a

subjective appreciation of the risk was not relevant to the threshold question of entitlement to

punitive damages.

## A. Jury Instruction on Willfulness

"Under Rule 59(a), a District Court has the discretion to grant a new trial on claims of . . .

erroneous jury instructions when it finds that those errors are substantial." *Murray v. Ennis*, 523

Fed. App'x 901, 902 (3d Cir. 2013). "While jury instructions must fairly and adequately

submit[] the issues in the case to the jury, a trial judge has broad discretion concerning the

particular language used in a jury instruction." *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d

1119, 1124 (3d Cir. 1992) (internal citations and quotations omitted).

Defendants argue that with respect to the jury instruction on willfulness, the Court should

have instructed the jury that any award of damages to Plaintiffs was contingent upon Defendants

"possess[ing] subjective knowledge that [their] conduct could violate CHRIA," or, more

specifically, that Defendants were "subjectively aware that there was a risk that [their] conduct could violate CHRIA."[4]

Here the question whether the jury instruction on willfulness was proper or not is dependent upon the definition of "willful" as used in the CHRIA. Pennsylvania's Statutory Construction Act of 1972 provides that when interpreting a statutory phrase, a court must first look for the meaning of the statute's word or term in that statute's definitions, then in the Statutory Construction Act, then a law dictionary and, finally, a standard dictionary, in that order. *Hawes v. Bureau of Professional and Occupational Affairs, State Real Estate Commission*, 204 A.3d 1019, 1024 (Pa. Commw. 2019). As set forth below, none of these sources dictate Defendants' desired incorporation of a subjective awareness element into the CHRIA's willfulness requirement.

The CHRIA statute does not contain a definition of the term "willful." And, neither does Pennsylvania's Statutory Construction Act. *See* 1 Pa. C.S.A § 1991. *Black's Law Dictionary* sets forth a variety of definitions for "willful," on a continuum ranging from "at least inexcusable carelessness" to "voluntary and intentional, but not necessarily malicious." Black's Law Dictionary (11th ed. 2019). *Merriam-Webster Dictionary* defines the term as "done deliberately; intentional." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/willful (last visited on Sept. 26, 2019). These sources thus provide a variety of meanings for the word "willful" without a clear preference for one.

---

[4] They reach this conclusion with reference to two cases, *Brand Marketing Group LLC v Intertek Testing Services, N A , Inc* , 801 F.3d 347 (3d Cir. 2015) and *Nace v Faith Christian Academy*, 2019 WL 1429575 (E.D. Pa. Mar. 29, 2019), which relied on *Brand Marketing*, even though neither *Brand Marketing* nor *Nace* provide a definition of willfulness and Defendants recognize that these cases are distinguishable because they were brought under a negligence theory, and not pursuant to a Pennsylvania statute. They nevertheless encourage the Court to import the subjective awareness components of these cases into the "willful" language of the CHRIA. Defendants' rationale for this request is the Court's citation of *Brand Marketing* in *Taha IV*, 367 F. Supp 3d at 330. However, *Brand*'s inclusion there was a reference to its citation by Plaintiffs in their brief, and the Court did not rely on it in reaching a conclusion. Thus, Defendants' reliance on *Brand Marketing* and *Nace* here is unavailing.

Given that the prescribed procedure of the Statutory Construction Act does not lead to a clear answer on the meaning of the word "willful" in the CHRIA, the Court again turns to the provisions of the Statutory Construction Act, which command that "the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly" and provide that the intention of the General Assembly is ascertained by considering, among other matters: (1) The occasion and necessity for the statute; (2) The circumstances under which it was enacted; (3) The mischief to be remedied; (4) The object to be attained; (5) The former law, if any, including other statutes upon the same or similar subjects; (6) The consequences of a particular interpretation; (7) The contemporaneous legislative history; and, (8) Legislative and administrative interpretations of such statute. *See* 1 Pa. C.S.A § 1921(c).

The CHRIA, a 1978 act, was passed to "establish a central repository for maintaining criminal history records throughout the Commonwealth[,]" as Pennsylvania was one of three remaining states without "some privacy and security legislation with respect to criminal justice records." Leg. Journal, House, Sept. 13, 1978, at 2824 & 2829. The preamble to the CHRIA reflects this intention:

> An [a]ct [r]elating to criminal history record information; providing for the protection of individual right to privacy and for the completeness and accuracy of, the control of dissemination of, the establishment of guidelines for the security of, and provision for quality control of criminal history record information; and providing for the right of individuals to inspect, review and challenge the accuracy of such information . . . ; and providing penalties for violations of this act.

19 P.S. §§ 1511–36, Act No. 305, P.L. 1274, Nov. 26, 1978. Together, this background addresses factors (1) through (5).

In the course of legislative debate in 1978, a representative asked whether the public would have access to criminal history record information under the bill, and one of the legislation's sponsors, a representative, clarified that the public would have access "[t]o dockets

and compilations kept in the normal course of business [but that t]hey do not have access today to the central state police repository of criminal justice records and they do not have it under this bill." *Id.* at 2827–28. The representative also addressed "keeping the usual records, that are available to the public and the press today, open to them and yet granting a degree of privacy and security as to those other records that are compiled by the state police and local police departments, but ensuring their accuracy . . . ." *Id.* at 2829. In 1990, during the course of a debate on amending the CHRIA, senators again raised privacy concerns. One senator spoke at length about his concerns with the government storing sensitive data: "One of the guiding principles in a democracy is when you have to err, you err on the side of individual rights, not the government. Our forefathers founded this nation based on a right of privacy. There can be no overriding factor to take that away from citizens in this country." Leg. Journal, Senate, June 26, 1990, at 2291. This legislative history, which satisfies factor (7), does not resolve the question of how to define willfulness, but it does provide a backdrop for how the CHRIA should be read.[5]

With this backdrop but the absence of any clear guidance on how the word "willful" should be construed in the CHRIA, the Court ascertained the meaning of the legally technical term by reference to case law. *See Commonwealth v Excler*, 243 Pa. 155, 159 (1914). Before trial, the Court predicted that the Pennsylvania Supreme Court would define willfulness in the CHRIA as a "showing of reckless disregard or indifference." *Taha IV*, 367 F. Supp.3d at 331.

At least one Pennsylvania court has adopted this definition. *See Long v. Southeastern Pa. Transp. Auth.*, 2017 WL 5652568, at *9 (Phila. Ct. Com. Pl. Jan. 1, 2017) (defining willfulness

---

[5] Notably, the statute as enacted in 1978 contained the same punitive damages provision –permitting the imposition of between $1,000 and $10,000 per willful violation—as the law does today. *See* 1978 Pa Laws 1286. $1,000 would, of course, have been a much greater penalty 30 years ago than it is today.

as whether the defendant either knew its actions violated the CHRIA or showed reckless disregard for their statutory duties, *i e.* as to whether their actions were prohibited by statute) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (same)). Thus, a defendant has committed a "willful" violation for purposes of the CHRIA if he acted with "reckless disregard or indifference" to the fact that his action violated the statute. The Third Circuit recently confirmed that a statutory violation is willful if there was a showing of "reckless disregard for the matter of whether its conduct was prohibited by the [statute]." *Stone v. Troy Constr., LLC*, 935 F.3d 141, 150 (3d Cir. 2019) (quoting *McLaughlin*, 486 U.S. at 133). Neither the Third Circuit's opinion in *Stone* nor the Supreme Court's opinion in *McLaughlin* suggest that in a statutory violation context, a subjective awareness of the risk is a predicate to a finding of willfulness. Nor have other Third Circuit decisions on statutory violations required an "awareness of the risk" as a predicate for a finding of willfulness. *See, e.g.*, *Souryavong v. Lackawanna Cty.*, 872 F.3d 122, 126 (3d Cir. 2017) (showing a "reckless disregard for the matter" is sufficient to constitute a willful violation); *Martin v. Selker Bros., Inc* , 949 F.2d 1986, 1296 (3d Cir. 1991) (proof of "evident indifference" toward the statute's requirements sufficient to establish a willful violation).

For the reasons set forth above, the jury instructions "fairly and adequately submit[ted] the issues in the case to the jury," *Tigg*, 962 F.2d at 1124, and Defendants' motion for a new trial on this basis shall therefore be denied.

### B. Jury Instruction on Punitive Damages

With respect to the jury instruction regarding punitive damages, Defendants do not appear to be challenging the instruction itself. Rather, their point seems to be that the language in the punitives instruction—"you must consider whether the County subjectively appreciated

14

the risk of harm to individuals protected by CHRIA" —or something like it, should also have been included in the jury instruction on willfulness. In other words, they argue that by including the language in the former, but not including it in the latter, the jury may have been led to conclude that a subjective appreciation of the risk was not relevant to the threshold question of whether the Defendants' actions were willful. But, if that was the case, that was exactly the conclusion they should have reached because, as set forth above, it is the correct one.

Even if Defendants are challenging the punitives instructions, the argument has been waived. While Defendants did make several objections to the jury instructions during the charging conferences at trial, they failed to object to the inclusion of the "subjective appreciation" language in the punitive damages instruction at the proper time, as Federal Rule of Civil Procedure 51(c) requires. *See id.* ("An objection is timely if (A) a party objects at the opportunity provided under Rule 51(b)(2); or (B) a party was not informed of an instruction or action on a request before that opportunity to object, and the party objects promptly after learning that the instruction or request will be, or has been, given or refused."); *see also Lesende v. Borrero*, 752 F.3d 324, 335 (3d Cir. 2014) (objections to jury instructions "must be both cogent and specific to the alleged error"). Because Defendants waived this objection, Rule 51 only allows the Court to consider "a plain error in the instructions . . . if the error affects substantial rights." Fed. R. Civ. P. 51(d)(2); *see also Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1289 (3d Cir. 1995) (holding that an alleged error will meet the plain error standard only if it "is fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice" and noting that reversal for plain error

"should only be invoked with extreme caution in the civil context") (internal citations and quotations omitted). As discussed above, the Court finds no such error here.

Even assuming the objection is not waived and the Court erred in instructing the jury, "any error was harmless because it is highly probable that the error did not contribute to the judgment." *City Select Auto Sales v. David Randall Assocs., Inc.*, 885 F.3d 154, 163 n.5 (3d Cir. 2018) (internal quotation omitted). Having heard the evidence from both sides, a reasonable jury could have chosen to credit Plaintiff's evidence. *See, e g., id* ("As the District Court noted, Clemmer's and Miley's testimonies differed in significant ways. In finding in favor of Miley, the jury necessarily rejected Clemmer's testimony."). Moreover, the punitive damages charge told the jury to award between $1,000 and $10,000 per willful violation, and including the "subjective appreciation" language there may have contributed to the jury awarding the *minimum* amount required under the statute.

Thus, inclusion of the "subjective appreciation of the risk of harm" language in the punitive damages instruction did not prejudice Defendants. In short, the charge, even if any objection to it is not waived and even if erroneous, was harmless error.

### C. Weight of the Evidence

Defendants assert that they are entitled to judgment as a matter of law or, in the alternative, a new trial, because the trial record lacked evidence from which a jury might reasonably conclude that Defendants committed a willful violation. Defendants' arguments are addressed below.

#### i. *Decisionmakers Did Not Realize That the ILT Might Violate the CHRIA*

Defendants argue that the decisionmakers did not realize the information available through the ILT could constitute "criminal history record information" within the meaning of the

CHRIA.  However, Defendants' lack of intent to violate the CHRIA is not relevant to the jury's determination of willfulness.  As discussed above, *see supra* Section IV(A), the instruction that "Defendants could have held a mistaken belief about CHRIA and still could have acted with reckless disregard or indifference" was proper.

### ii.  Decisionmakers Did Not Realize the Need to Seek Legal Advice

Defendants argue that Fulton testified that in 2011 he did not believe that "any of the information on [the] ILT could be considered CHRIA." However, he also testified that he understood the need for the confidentiality of inmate records and understood that improper exposure of the CHRIA information could ruin reputations.  Gubernick testified that he had concerns about publicly posting confidential information.

Regardless, Fulton and Gubernick did not seek out textual authority or legal advice. Fulton last read the CHRIA and the Handbook in 2003, and Gubernick never consulted the Handbook to determine compliance with the CHRIA.[6]  Plaintiff's expert Richard Subia testified that this violated acceptable standards for corrections professionals, because "when you're dealing with confidential information, that's of utmost importance as it relates to information practices."

Subia further testified that "if you're going to change the practice of providing confidential information from its current practice, it would be customary to ensure that you're not violating somebody's privacy rights when you do that.  You would get an opinion from a legal person." But, Fulton never had a discussion with any lawyer regarding compliance with

---

[6] Defendants also argue that when the ILT was launched, there was no authority to support a conclusion that the ILT might violate the CHRIA.  Given Defendants' testimony that they did not seek out any authority or guidance, they could not have known this to be the case, and thus cannot now use this argument to justify their decision-making.

the CHRIA. During the 2011 changes to the ILT, nobody sought guidance from the County Solicitor, the Pennsylvania Attorney General, or outside counsel.

If credited by the jury, this body of testimony provides a sufficient basis to conclude that Defendants understood the need for confidentiality and had concerns about publicly posting confidential information, but they forwent legal advice. A reasonable jury could conclude that Defendants thus acted willfully in violation of their statutory obligations.

### iii. The Attorney General's Handbook Supported Defendants' Understanding of the CHRIA

As a post hoc defense, Defendants quote selectively from the Handbook to argue that it supports their understanding of CHRIA. However, both Fulton and Gubernick testified that they did not consult the Handbook before posting the information on the ILT to determine whether they were in compliance with the CHRIA. Defendants cannot now use the Handbook to justify their conduct.

### iv. Other Criminal Justice Professionals Supported Defendants' Understanding of the CHRIA

Defendants also argue that in meetings with criminal justice professionals, none of them raised concerns about the ILT's legality. The testimony about these meetings was generalized, and Defendants did not explore specifics about the meetings at trial. Defendants also claim that they investigated and learned other counties had similar information on their ILTs, and none were cited for CHRIA violations. Although Gubernick reviewed other counties' websites, he testified that he did nothing more than go to two or three counties' home pages, and he did not contact officials at any of those counties' prisons to question them about their ILTs.

Testimony regarding such a cursory review of other counties' practices could support a jury's finding that Defendants were recklessly indifferent to their statutory obligations.

### v. *Training Did Not Support the Conclusion that Defendants Might Violate the CHRIA*

Finally, Defendants argue that Fulton's and Gubernick's training did not suggest that the information they were posting on the ILT would violate the CHRIA, particularly because they contend that none of the information initially came from CLEAN or JNET.

Defendants make this argument even with respect to the FBI and State ID numbers by claiming they did not believe this information could violate the CHRIA. However, Defendants knew that the State ID and FBI numbers came from the CLEAN Network and were to be kept confidential. Fulton testified that when he consulted the Pennsylvania State Police on whether posting those numbers on the ILT was permissible, the answer he received was unclear at best. Fulton then consulted the JTAC Training Manual, which "did not speak . . . directly in terms of dissemination" but did say that "information on the CLEAN network is considered confidential." Fulton interpreted this to mean the numbers were not protected and disseminated them without consulting the Attorney General for further guidance.

Beyond the evidence described above, Plaintiff presented the jury with testimony that Fulton knew the 2011 changes to the ILT were "dramatic"; Fulton and Gubernick both understood that privacy was an important part of the CHRIA; Fulton understood the dangers of criminal history information falling into the hands of Mugshots.com because his daughter's mugshot had been disseminated on the internet in that manner and he twice paid to have her mugshot removed; and Fulton did not respond to at least one person's inquiry to correct or remove incorrect information on the ILT about his father. In a renewed motion for judgment as a matter of law where the plaintiff prevailed at trial, the trial record must be examined "in a light most favorable to the plaintiff." *Dudley*, 555 F.2d at 101. Given this standard, if credited by the jury, this body of evidence and testimony provides a sufficient basis to conclude that Defendants

19

acted willfully. The record is not "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir. 1980). Therefore, Defendants' motion for judgment as a matter of law shall be denied.

As an alternative to seeking judgment as a matter of law based on insufficiency of evidence, Defendants also argue for a new trial, which as they note has a different standard of review. *See Wilson v. Philadelphia Det. Ctr.*, 986 F. Supp. 282, 287 (E.D. Pa. 1997) ("A court analyzing a motion for a new trial need not view the evidence in the light most favorable to the verdict winner.") (citing *Magee v. General Motors Corp.*, 213 F.2d 899, 900 (3d Cir. 1954)). Defendants make no new arguments here, instead pointing to the arguments they made on the weight of the evidence in seeking judgment as a matter of law. Even under this more lenient standard, Defendants' arguments fail because they overlook the substantial amount of evidence adduced during the trial that supported the jury's verdict. *See also Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 309 n.18 (3d Cir. 2007) (granting a new trial based on the verdict being against the weight of the evidence is "extraordinary relief"). For the reasons discussed above, Defendants have not shown that the "great weight of the evidence" is contrary to the verdict. *Springer*, 435 F.3d at 274.

### D. Evidentiary Errors

Next, Defendants argue for a new trial by challenging four of the Court's evidentiary rulings: (1) allowing Plaintiff to present evidence and testimony related to expunged records; (2) admitting evidence and testimony regarding FBI and State ID numbers; (3) limiting the scope of the Defendants' expert witness's testimony regarding the criminal justice community; and (4) allowing Plaintiff's expert to testify to the nature and extent of the victims' harm as it related to punitive damages. Each purported error will be considered in turn.

20

### i. Admission of Expungement Evidence

Over Defendants' objections, the Court allowed Plaintiff to present evidence and testimony at trial related to expunged records, or rather Defendants' failure to expunge records that a court order required to be expunged. In a motion *in limine*, Defendants expressed concern that if such evidence were permitted it would lead to thousands of mini-trials on class members' expungements, thus creating individualized issues that are inappropriate for a class action. That did not happen. Nevertheless, Defendants remain concerned that the introduction of the evidence inappropriately introduced individualized inquiries into the trial. But, the nature of the harm to individual class members was not the purpose for which the evidence was introduced. It was admitted as one factor for the jury to consider in evaluating whether Defendants' conduct was recklessly indifferent and, accordingly, whether the willfulness requirement of the CHRIA punitive damages section had been proved. As such, the Court finds no error in its admission.

### ii. Admission of Evidence of FBI and State ID Numbers

Defendants' argument that FBI and State ID numbers should not have been introduced into evidence is premised on a similar rationale, *i.e.* that because Plaintiff Taha did not have an FBI or a State ID number while other members of the class did, any discussion of the numbers necessarily injected individualized inquiries into the trial. But this distinction did not warrant an exclusion of the evidence. Defendants decided to publish FBI and State ID numbers as a matter of course, a decision that was relevant to the question of whether they were recklessly indifferent as to whether or not such publication would violate CHRIA. The fact that Taha himself did not have these numbers (because he did not have a criminal history and, thus, had not been assigned them) is of no consequence in that if he had been assigned numbers, they would have been put up on the ILT along with all of the other information about him.

### iii. *Limitation of Defendants' Expert Witness Testimony*

Next, Defendants argue that the Court erred in limiting the scope of their expert attorney, Stephen Snook, to his "personal understanding" of the CHRIA and not allowing him to testify as to the views of the "criminal justice community" regarding the CHRIA.

Snook's testimony was a source of considerable argument both before and during trial. At the close of expert discovery, Plaintiffs sought pursuant to Federal Rules of Evidence 702, 703, 403, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to strike in its entirety Snook's testimony. Defendants sought to use him as an expert on the Pennsylvania criminal justice community's statutory interpretation of the meaning of the term "criminal history record information" in the CHRIA. The Court denied the motion. Plaintiff, nevertheless, persisted and, in a motion *in limine* filed immediately prior to trial, particularized his concern with Snook's testimony. Specifically, he asked that Snook be precluded from testifying about: (1) legal opinions regarding whether the ILT of any county violated the CHRIA; (2) the legislative history of the CHRIA; (3) any opinions based on what the criminal justice community believed as to rap sheets, the scope of the CHRIA or whether ILTs generally violated the CHRIA; (4) whether counties other than Bucks County had ILTs and what those ILTs looked like; and, (5) CHRIA audits conducted on Bucks and other counties for the years 2014–16. The Court granted the motion except insofar as it reserved for trial decisions on whether Snook could offer expert opinions about what the criminal justice community believed as to rap sheets (whether or not they were covered by the CHRIA), the scope of the CHRIA, or whether the ILT violated the CHRIA.

At trial, Snook testified that he did not consider himself an expert on the CHRIA and had not studied the statute in depth, upon which the Plaintiff objected once again to his testimony.

The Court ruled for Plaintiff, finding that any testimony regarding the views of unidentified members of the criminal justice community regarding the CHRIA was inadmissible hearsay.

Defendants now argue that Snook's opinions were offered to show the "state of mind of the criminal justice community." However, the state of mind exception to the hearsay rule applies to a "declarant's then existing state of mind," *see* Fed. R. Evid. 803(3), and is not a vehicle for aggregating a community's opinions.

Defendants also rely on the language in Rule 703 of the Federal Rules of Evidence which provides that: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. However, Defendants failed to demonstrate that experts in Snook's field use anonymous conversations as the basis for their expert opinions. "If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999). The Court properly limited the scope of Snook's testimony.

### iv. *Admission of Plaintiff's Expert Witness Testimony*

Finally, Defendants argue for a new trial based on the Court permitting certain testimony by Plaintiff's expert, Dr. Sarah Lageson. The Court first considered this argument in a pretrial *Daubert* opinion, *Taha v. Bucks County*, 2019 WL 1900474 (E.D. Pa. Apr. 29, 2019).[7] At trial,

---

[7] The Court determined she could not testify "as to the question of 'willfulness' itself" because Plaintiff failed to provide a reason why Lageson's testimony "would bear on the willfulness of Defendants' actions." *Id* at *2. But she was allowed to testify to the "nature and extent of [the] victim's harm" as it related to "'an appropriate punitive damage award.'" *Id* (quoting *Kirkbride v Lisbon Contractors, Inc*, 521 Pa. 97, 102 (1989)) In other words, if the jury decided that the Defendants' actions were willful, their next order of business was to decide whether to award $1,000 or $10,000 per violation or something in between. In deciding that number, it was useful to consider the

23

the Court limited Lageson's testimony to the "risk of harm" created by Defendants' misconduct. Contrary to Defendants' assertions, Lageson did not testify to the nature and extent of individual class members' harm. Rather, she testified concerning the potential risk of harm and stigmatization as a result of putting criminal history information on the internet. Lageson's testimony was elicited to show Defendants' awareness of that risk, which was relevant to the jury's punitive damages determination. The testimony therefore was relevant and satisfied Federal Rule of Evidence 702's fit requirement. *See United States v. Velasquez*, 64 F.3d 844, 850 (3d Cir. 1995) ("There must be a valid connection between the expertise in question and the inquiry being made in the case.").

Admission of Lageson's testimony was proper. Therefore, Defendants' motion for a new trial on this basis shall be denied.

### E. Motion for Remittitur

In the alternative to a request for a new trial, Defendants move for remittitur on the ground that the jury's award was excessive and inconsistent with the evidence. The verdict form which was submitted to the jury read as follows:

1. Did the plaintiff and the class prove that the County committed a willful violation of CHRIA?

   ___ YES          ___ NO

   If you answer no, please stop, sign and date this verdict sheet and return to the court. If you answer yes, please proceed to the next question.

---

subjective awareness by Defendants of their violation of the CHRIA as well, as a general matter, of the harmful consequences associated with a release of criminal history information.

2. What is the amount of punitive damages that you award to the plaintiff and each member of the class?

$ _____ (fill in amount of not less than $1,000 nor more than $10,000).[8]

The jury answered "yes" to the first question—the plaintiff and the class proved that the County committed a willful violation of the CHRIA—and filled in an amount of $1,000 as the amount of punitive damages to be awarded to the plaintiff and to each member of the class.

Despite the jury award being at the very low end of the damages that the jury was required by the statute to award once it made the determination that Defendants violated the CHRIA—as in, they were empowered to award up to $10,000 per violation but chose to award $1,000, the lowest statutory amount—Defendants argue that Plaintiff's damages are "grossly excessive" because class-wide they could aggregate to an award of over $60 million (66,799 class members multiplied by $1,000).[9] Remittitur arguments, however, should be directed at the jury verdict, not at a hypothetical aggregate amount. *See* 11 Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2815 (3d ed.) ("If the trial court determines that *the verdict in a case* is excessive, it may order a complete new trial or a new trial limited to the issue of damages.") (emphasis added). Here, the jury's verdict was an award of $1,000 for each violation. *See* 1 Pa. C.S.A. § 1930 ("Whenever a penalty . . . is provided for the violation of a statute, such penalty . . . shall be construed to be for each violation.").

---

[8] Plaintiff argues, citing only one case, that Defendants waived any challenge to the verdict by submitting the proposed verdict form that was ultimately used and failing to object to the verdict form "[A]rguments raised in passing . . . but not squarely argued, are considered waived." *John Wyeth & Bro Ltd v CIGNA Int'l Corp* , 119 F.3d 1070, 1076 n 6 (3d Cir. 1997).

Even if, however, Defendants' challenge were waived, courts still consider remittitur arguments. *See, e g , Wright v Cacciutti*, 2015 WL 3654553, at *21 (M.D. Pa June 11, 2015) ("Despite the fact that Defendants waived any objection to the category of past medical damages being submitted to the jury, the Court finds that the jury's award is so excessive and beyond reasonable grounds that remittitur of this award is necessary.").

[9] It should be noted that since the class includes people whose information was gathered as far back as 1938, many class members will be deceased or likely will be impossible to track down.

In essence, by arguing that the jury award of $1,000 per violation should be reduced, Defendants are asking this Court to substitute its own judgment of what is an appropriate penalty for a CHRIA violation for that of the Pennsylvania legislature. Ultimately, statutory penalties are the product of legislative determination. The Pennsylvania legislature has made clear that statutory remedies are preferred over common law. *See* 1 Pa. C.S.A § 1504 ("In all cases where a remedy is provided . . . or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect."); *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 583–84 (1996) (directing reviewing courts to "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue") (internal quotations omitted).

Defendants have cited no authority to support the proposition that a federal court should circumvent the expressed will of the state legislature. The cases that they do cite for the proposition that courts in this Circuit "routinely" reduce jury verdicts even where the damages were statutorily authorized make the quite contrary point. In *Burris v. Richards Paving, Inc.*, 472 F. Supp.2d 615, 620 (D. Del. 2007), the court reduced the plaintiff's compensatory damages to be "consistent with the applicable statutory maximum." In *United States ex rel. Dunleavy v. County of Delaware*, 2000 U.S. Dist. LEXIS 14980, at *29–31 (E.D. Pa. Oct. 12, 2000), the court declined to reduce the damages, noting that "while a remittitur may be used to reduce an unjustified damage award it has not . . . been used to evade a statutory mandate . . . ." Finally, in *Rush v. Scott Specialty Gases*, 930 F. Supp 194, 201- 02 (E.D. Pa. 1996), the court reduced the jury's award by ten percent, but did so in reliance on due process cases, which are inapplicable here. *See infra* 28–29.

"Statutory damages serve the dual purposes of compensation and deterrence . . . ."
*Schiffer Publ'g, Ltd. v Chronicle Books, LLC*, 2005 WL 67077 (E.D. Pa. Jan. 11, 2005).
Furthermore, statutory damages "remedy a wrong which would otherwise go unremedied if
actual damages could not be proven." *Raydiola Music v. Revelation Rob, Inc.*, 729 F. Supp. 369,
375 (D. Del. 1990); *see also Taha III*, 862 F.3d at 305 ("Given the particular harms that can be
wrought by the release of someone's criminal history information, there may be instances in
which an individual faces consequences beyond humiliation and embarrassment which may be
difficult or impossible to evaluate in monetary terms."); *Bohus v. Restaurant.com, Inc.*, 784 F.3d
918, 930 (3d Cir. 2015) ("We cannot disregard the legislature's choice to award statutory
damages in the absence of actual damages."); *Perrone v. General Motors Acceptance Corp.*, 232
F.3d 433, 436 (5th Cir. 2000) ("[S]tatutory damages are reserved for cases in which the damages
caused by a violation are small or difficult to ascertain."). Such penalties provide remedies for
individuals who would be unlikely to pursue them otherwise. In creating a private right of
action, the legislature also recognized that the state has insufficient manpower for enforcement,
and thus empowered individuals to act as private attorneys general. *See Schnall v. Amboy Nat.
Bank*, 279 F.3d 205, 217 (3d Cir. 2002) (acknowledging that the government has "limited
resources to devote to enforcement" and that ceding enforcement "to individuals" may be more
cost effective). Statutory damages are thus the primary enforcement mechanism of the CHRIA,
and Defendants here were on notice of the consequences of a CHRIA violation.

Certainly, the concerns about aggregate awards are particularly acute in the class action
context when a defendant committed many violations of a statute against many plaintiffs. *See
Parker v. Time Warner*, 331 F.3d 13, 22 (2d Cir. 2013) (recognizing that "[i]ssues arise from the
effects of combining a statutory scheme that imposes minimum statutory damages awards on a

per-consumer basis . . . with the class action mechanism that aggregates many claims—often because there would otherwise be no incentive to bring an individual claim"). Not surprisingly, large numbers of identical claims for small statutory penalty awards create large aggregate recoveries. While the Court may find the outcome here troubling, it will not go against the express mandate of the Pennsylvania legislature. Modification of a state statute is the province of the legislature, not the courts.

Given that backdrop, the role of the district court in considering Defendants' remittitur request "is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Browning-Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279 (1989).[10] The standard for remittitur is "articulated in a number of ways[,]" *Blakey v. Continental Airlines, Inc* , 992 F. Supp. 731, 734 (D.N.J. 1998), with both the Pennsylvania Supreme Court and the Third Circuit setting a high bar for granting remittitur. Under Pennsylvania law, "[j]udicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." *Haines v. Raven Arms*, 536 Pa. 452, 455 (1994). The Third Circuit has explained that courts reduce damages awards in two circumstances: (1) to satisfy constitutional due process concerns if the award is unconstitutionally excessive, or (2) if an award is unreasonable on the facts of the case at hand. *See Cortez*, 617 F.3d at 715–16.

A due process argument is unavailing here in that this Court has already found that the

---

[10] Plaintiffs mistakenly apply only the federal standard, without reference to state law.

28

Due Process Clause protects persons, not governmental entities such as Bucks County. *See Taha I*, 172 F. Supp.3d at 873. This comports with Supreme Court and Third Circuit authority. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union . . . ."); *Pennsylvania v. Riley*, 84 F.3d 125, 130 n.2 (3d Cir. 1996) (same); *see also East St. Louis v. Circuit Court for Twentieth Judicial Circuit*, 986 F.2d 1142, 1144 (7th Cir. 1993) (holding that East St. Louis cannot invoke the Due Process Clause's protection because it is not a "person" under the Fifth or Fourteenth Amendment). Moreover, recent Supreme Court cases on the Due Process Clause have used the penalties imposed by state legislatures as a barometer for awards that do *not* violate due process. *See BMW*, 517 U.S. at 583–84 (legislative judgments are entitled to "substantial deference"); *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 411–12 (2003) (referencing a Utah statute's award of $10,000 per violation as a benchmark).

With respect to the question of whether the award is unreasonable given the facts at hand, "[t]here must be a rational relationship between the specific injury sustained and the amount awarded." *Gumbs*, 823 F.2d at 773; *see also Spence*, 806 F.2d at 1201 (explaining that remittitur is employed "when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive"). Plaintiffs cite to another formulation of the remittitur test, which provides that "where the verdict is so large as to shock the conscience[,]" the Court must order the plaintiff "to remit the portion of the verdict in excess of the maximum amount supportable by the evidence or if the remittitur [is] refused, to submit to a new trial." *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983). Defendants rely on the factors set out in *Kirkbride*, which include evaluating the character of the tortious act, the nature and extent of the harm, and the wealth of the defendant.

*See* 521 Pa. at 104.

Regardless of which test applies, Defendants do not prevail under of them. First, Defendants argue that no evidence was adduced at trial proving that they intended to violate the CHRIA, but as set forth *supra* Sections IV(B)–(C), it was. *See Spence*, 806 F.2d at 1201 (given the evidence Plaintiffs presented at trial, the jury's award was not "clearly unsupported"). Next, Defendants revive their argument that punitive damages are excessive given that no compensatory damages were awarded in this case; but this Court and the Third Circuit have already considered and rejected this argument.[11] Finally, Defendants urge the Court to consider that deterring Bucks County is not necessary and that allowing the verdict to stand would create a burden on taxpayers. While there is no doubt that the taxpayers of Bucks County will be negatively impacted by the jury's verdict, one could argue that Defendants should have taken their interests into consideration before uploading the information onto the ILT.[12]

Contrary to Defendants' argument that the jury's award violates the Third Circuit's directive that "any punitive damages imposed . . . be reasonable," *Taha III*, 862 F.3d at 305 n.8, the jury awarded the *minimum* statutory damages authorized by the Pennsylvania legislature in the CHRIA. *See* 18 Pa. C.S.A. § 9183(b)(2). By awarding an amount within the statutory range, the jury ensured there was a "rational relationship between the specific injury sustained and the

---

[11] The Third Circuit previously ruled: "In the penalties provision of CHRIA, the Pennsylvania Legislature explicitly provided for the imposition of punitive damages without including any language making the recovery of compensatory damages a pre-requisite for their imposition." *Taha III*, 862 F.3d at 304 05. The cases Defendants cite confirm this as well. *See, e g , Kirkbride*, 521 Pa. at 102 ("[e]ven though compensatory damages had not been awarded, punitive damages could be appropriate"), *Sprague v Walter*, 441 Pa. Super 1, 72 (1995) ("Under Pennsylvania law, punitive damages need bear no proportional relationship to the compensatory damages awarded in a particular case.") (citing *Kirkbride*, 521 Pa at 103–04)

[12] In support, Defendants cite decisions from other state courts, which are not binding on this court, and cases brought under the Telephone Consumer Protection Act with due process claims, *see Golan v FreeEats.com*, 930 F 3d 950, 962 (8th Cir. 2019); *Maryland v Universal Elections, Inc* , 862 F. Supp.2d 457, 465 (D. Md. 2012); *United States v Dish Network LLC*, 256 F. Supp.3d 810, 906 (C. D. Ill. 2017). As the Court has already addressed, a due process claim is not available here. To the extent Defendants rely on *Feingold v SEPTA*, 517 A.2d 1270 (Pa 1986), the Third Circuit has not found that opinion persuasive in this case. *See Taha III*, 862 F 3d at 306

30

amount awarded." *See Gumbs*, 823 F.2d at 773. Given the dictates and the set of circumstances at issue here, an award of $1,000 per violation—the minimum award *required* under the statute for a willful violation- —does not "shock the conscience" and is not "plainly excessive and exorbitant." *Kazan*, 721 F.2d at 914; *Haines*, 536 Pa. at 455.

Accordingly, Defendants' request for remittitur shall be denied. An appropriate order follows.

BY THE COURT

**WENDY BEETLESTONE, J.**

**October 4, 2019**

ENTD OCT · 4 2019